[No. 23484. Department One. April 11, 1932.]

F. G. BARNES *et al., Appellants,* v. STANDARD OIL COMPANY OF CALIFORNIA, *Respondent.*[1]

*Fisk & McCarthy,* for appellants.

*Dey, Hampson & Nelson* and *Atwell & Moore,* for respondent.

PARKER, J.—The plaintiffs, Barnes and wife, commenced this action in the superior court for Cowlitz county, seeking recovery from the defendant oil company of rent claimed to be owing to them by the oil company as their tenant for its occupancy of premises owned by them, situated in the city of Kelso, in that county. Their claim of recovery is rested upon the theory that the oil company became and remained, during the time in question, in the occupancy of their

[1]Reported in 9 P. (2d) 1095.

premises under a lease by them to A. B. Little, which lease, they claim, was assigned by Little to the oil company.

Our problem is, in substance, whether or not the contract between Little and the oil company for its occupancy of the premises was an assignment of all of Little's rights under his lease of the premises from Barnes and wife, so as to make the oil company, in legal effect, their tenant. A trial upon the merits in the superior court, sitting without a jury, resulted in findings and judgment denying to Barnes and wife any recovery, from which they have appealed to this court.

There is no substantial dispute as to what we conceive to be the controlling facts. The premises were leased by Barnes and wife to Little by a duly executed lease, reading, in so far as need be here noticed, as follows:

"This lease made this 24th day of March, 1927, between F. G. Barnes and Elenora Barnes, his wife, party of the first part, lessors; and A. B. Little, party of the second part, lessee, WITNESSETH:

"(1) The lessors do hereby lease and demise to the lessee, and the lessee does hereby hire and take from the lessors, the following described premises in Cowlitz County, Washington, to-wit: The Building situated on Lot 6, Block 2, Central Addition to the City of Kelso, Wn., and known as the Gateway Service Station, for a period of three years, beginning the 24th day of March, 1927, and ending the 23rd day of March, 1930.

"(2) The lessee agrees to pay to the lessors annual rental of Fifteen Hundred Dollars, in gold coin of the United States, of the present weight and fineness, payable in equal monthly installments of One Hundred Twenty-five Dollars, . . .

"(4) The lessee agrees to use said premises for an automobile service station and for no other purpose, without the written consent of the lessor."

Little then went into possession of the premises under this contract and continued in possession, using the premises for an automobile service station, dealing not only in petroleum products but also dealing in automobile accessories, permitting another to carry on a battery service in a portion of the premises. Such possession and use of the premises by Little continued until a contract between Little and the oil company became effective on November 1, 1928, which contract, in so far as need be here noticed, reads as follows:

"ADVERTISING AND FACILITIES LEASE

"THIS AGREEMENT, dated the 4th day of October, 1928, by and between Albert B. Little, hereinafter called the Lessor, and Standard Oil Company of California, a corporation, hereinafter called the Lessee, WITNESSETH:

"(1) The Lessor leases to the Lessee for a period commencing on the 1st day of November, 1928, and ending on the 23rd day of March, 1930, and thereafter until cancelled by ninety (90) days' written notice from either party to the other of its intention to terminate the lease:

"(a) The exclusive right, except as waived by the Lessee in writing, to paint, maintain, and otherwise use, for advertising the name of the Lessee and its products, all surfaces of all buildings, fences, and other structures which are now or which may hereafter be used for advertising petroleum products on the premises hereinafter described, or on property controlled by the Lessor adjacent thereto or in the vicinity thereof.

"(b) The exclusive right to the use of the subsurface of said property (including any premises adjacent thereto or in the vicinity thereof controlled by Lessor) for the storage of gasoline or other motor fuel.

"(c) The exclusive right to the use of tankage, pumps, containers, pipes and other facilities now on said premises, or which may be hereafter constructed thereon, for the storage, delivery and sale of petroleum products.

"(d) The exclusive right to the use of the surface

of said property for storage containers for petroleum products, either affixed to the land or movable, insofar as may be permitted by the laws of the State, the ordinances of municipalities and rules and regulations of governmental officers.

"(2) Said lease shall be on the following terms:

"(a) In the event that the Lessor holds the property under lease, then this lease up to the expiration of the term hereof, shall continue during any renewals or extensions thereof, and during the life of any lease which may be substituted therefor.

"(b) The Lessee agrees to use the property herein leased for the sale of gasoline and other motor fuels and to diligently promote such sale, and the Lessee agrees to pay to the Lessor on the 15th day of each and every month, as rental, a sum equivalent to one cent (1c) a gallon for each gallon of gasoline sold from said premises during the preceding calendar month, but not less than $74 monthly during the term of this lease.

"(c) In the event that the Lessor holds said premises under lease from a third party and the Lessor shall fail to pay any rentals reserved in such lease, or to perform any of the obligations on his part to be performed thereunder as and when the same shall fall due, then and in that event the Lessee hereunder may, at its option, pay said rentals reserved under said lease and/or perform such obligations and reimburse itself out of the rentals due to the Lessor herein.

"(d) The Lessee shall have the exclusive right to erect, install and maintain on said premises such additional appliances, tanks, pumps, containers, pipes and other facilities and such additional underground tanks, pipes and other equipment as may from time to time be necessary or desirable in carrying on the business of storing, delivering and selling petroleum products and to alter or remove such additional installations or any part thereof at any time during the term hereof or within thirty (30) days after the expiration or other termination of this lease.

"(e) In the event it shall become unlawful to sell, store or handle any gasoline on the property herein-

after described, then this lease shall terminate and the parties hereto shall be relieved from all further obligations hereunder.

"(f) In the event that either party shall fail to perform any of the provisions of this lease and said default shall continue after ten (10) days' written notice from the party not in default, then this lease may be terminated at the option of the party not in default.

"(g) The premises herein referred to are situated in the City of Kelso, County of Cowlitz, State of Washington, and are more particularly described as follows: The building situated on Lot 6, Block 2, Central Addition to the City of Kelso, Washington, and known as the Gateway Service Station.

"(h) The Lessee has appointed or is about to appoint the Lessor the Agent of the Lessee for the distribution of petroleum products of the Lessee; in the event of the termination of said agency for any reason whatsoever, this lease shall at Lessee's option also terminate and the parties hereto thereupon shall be relieved of any further obligations hereunder; . . ."

Thereafter, Little remained in possession and control of the premises, for the oil company, in so far as it was entitled to the occupancy thereof under that contract, and for himself, in so far as he was entitled to the occupancy thereof apart from the rights of the oil company, until the expiration of the terms of his lease from Barnes and wife and his contract with the oil company. This action was commenced in May, 1930, after the expiration of those terms.

For the purpose of showing how Little and the oil company construed their contract touching Little's right to retain some measure of right of occupancy of the premises during the term of their contract, we quote from uncontradicted testimony. Beverly, a witness called in behalf of the oil company, testified in part as follows:

"Q. What is your official capacity with the Standard Oil Company? A. Special agent and branch manager. Q. Were you in such capacity on November 1, 1928? A. Yes; ever since that time. Q. Manager of what locality? A. County of Cowlitz. Q. Have you been familiar with the property in question here during the period from October 1, 1928, up until March 23, 1930? A. Yes. Q. Who has been in possession of that property during that period? A. A. B. Little. Q. Who was running that station, that is, vending gasoline, etc.? A. A. B. Little. Q. Did you ever give Mr. Little any instructions of any kind as to how to operate that place? A. No. Q. Are all the employees of the Standard Oil under your control in that district? A. Yes. Q. What else was located in that building in question? A. Battery shop, wash rack, storage. Q. What kind of storage? A. Storage for automobiles, for washing and overnight storage. Q. Who had charge of those various operations in that building? A. Mr. Little. Q. Who had charge of the battery shop? A. Mr. Lincoln. Q. Did you have any authority of any kind over any of those people in that building? A. No jurisdiction whatever. Q. How was this gasoline sold to Mr. Little? A. By tank, wagon and gasoline storage. Q. Sold outright to him, was it? A. Yes. Q. How about the oils and the petroleum products, how were they sold? A. All sold outright, cash at time of delivery. Q. How big a portion of this building was used in the vending of petroleum products which the Standard Oil Company sold to Mr. Little? A. The area of the building occupied approximately 7500 square feet. That portion of the building devoted to the sale of petroleum, I would say, would not exceed one-twentieth of the total area of the property. Q. The rest of the area of this building, was that used at all in vending of petroleum products or products sold to Little by the Standard Oil Company? A. No, sir."

Lincoln, a witness called in behalf of the oil company, testified in part as follows:

"Q. Do you know Mr. Barnes? A. Yes. Q. Are you the Lincoln that was referred to as operating the

battery shop in question? A. Yes. Q. Who did you get permission from to occupy the space you occupied in that building? A. Mr. Little. Q. What arrangements did you have with Mr. Little? A. As I understood, I was to assist Mr. Little to pay rent to sell gas and oil for him. Q. What part of the building did you occupy there? A. The northwest corner. Q. What did you have there? A. Battery equipment. Q. What kind of business were you conducting there? A. Battery business. Q. Was it separate and apart from Mr. Little's business? A. Yes. Q. Were you operating that as sole proprietor? A. The last two years, yes. Q. What other kinds of business were conducted at that place by Mr. Little? A. Car washing and greasing. Q. Anything else? A. Sale of gas and oil. Q. Was there any storage of automobiles? A. There was two cars stored there regularly. Q. Was there any automobile accessories or anything of that kind sold there? A. A few light globes; a few tires sold. Q. All the dealings you had were with Little? A. Yes. Q. You never had any dealings with Mr. Beverly or any other member of the Standard Oil Company around here with regard to that company? A. No, sir."

Other testimony corroborates in a considerable measure the above quoted testimony of those two witnesses. We do not find any evidence in the record to the contrary.

There is here invoked in behalf of Barnes and wife the general rule that, when a lessee sublets his entire leasehold for the entire period it is to run, such sublease becomes, in legal effect, an assignment of his entire leasehold and gives rise to the relation of landlord and tenant between the original lessor and the sublessee. This general rule and its application are noticed in *Weander v. Claussen Brewing Ass'n*, 42 Wash. 226, 84 Pac. 735, 114 Am. St. 110, though in that case the sublease was held to be, in effect, an assignment of the original lease because the lessee

therein parted with his entire leasehold estate, his specified, reserved rights being only personal in him, not running with the land. Judge Hadley, speaking for the court, there observed:

"Respondent parted with its entire interest. It is true, it reserved the right of re-entry at the close of the term; but that provision is without force for the reason that, at the end of the term, there would be nothing left of which it could take possession. It also reserved the right of re-entry in case of default in payment of rent or breach of any of the covenants. The rental terms and covenants being, however, precisely the same as its own in the lease with its lessor, the authorities maintain that the legal effect of the instrument is not changed from that of an assignment to that of a lease, even though the right of re-entry for condition broken be reserved. While there is some conflict upon this point, yet we think the weight of authority decidedly supports the rule as stated."

In our later decision in *Sheridan v. Doherty*, 106 Wash. 561, 181 Pac. 16, the sublease in question was upon the same theory held to be, in legal effect, an assignment of the entire leasehold estate of the original lessee.

It seems to be also well-settled law that, in order for a contract in the form of a sublease to have the legal effect of an assignment of the leasehold interest of the original lessee, the original lessee must have not only granted to his sublessee a leasehold right in the premises for the entire, remaining period of his leasehold, but must also have granted his entire leasehold in the whole premises or some specified part thereof. When the authorities speak of the necessity of granting the "term," they use that word in the sense of "estate," and not a mere grant for the entire, remaining period of the original lease.

In *Weander v. Claussen Brewing Ass'n*, 42 Wash. 226, 84 Pac. 735, there is quoted with approval from 1

Taylor, Landlord and Tenant (9th ed.), § 16, as follows:

"A *term* signifies not only the limitation of time, or period granted to the lessee for the occupation of the premises, but it includes also the estate and interest in the land that pass during such period."

In *Davis v. Vidal,* 105 Tex. 444, 151 S. W. 290, 42 L. R. A. (N. S.) 1084, Justice Dibrell, speaking for the court, observed:

"By the word 'term,' as used in the statement of this principle of law, is meant something more than the mere *time* for which the lease is given, and the instrument must convey not only the entire time for which the lease runs, but the entire estate or interest conveyed by the lease. Mr. Blackstone in his commentaries, book 2, page 144, in commenting on the significance of the word, 'term,' when used in leases, says: 'Thus the word *term* does not merely signify the time specified in the lease, but the estate also and interest that passes by the lease; and therefore the *term* may expire, during the continuance of the *time,* as by surrender, forfeiture and the like.' The meaning of the word 'term' as defined by Blackstone above was adopted by the Supreme Court of Massachusetts in the case of *Dunlap v. Bullard,* 131 Mass. 162, and by a number of text-writers on the subject of assignments and sub-leases."

In *Barkhaus v. Producers Fruit Co.,* 192 Cal. 200, 219 Pac. 435, this same view was expressed. See 3 Bouvier's Law Dictionary, Rawles Third Revision, p. 3259, and 38 Cyc. 184.

We have seen that the leasehold estate of Little in the premises is unrestricted, other than that he agrees to use the premises for an automobile service station and for no other purpose. This manifestly means that he can use it for any purpose for which an automobile service station is ordinarily used. We have also seen that, in the right of occupancy of the premises by the

oil company under its contract with Little, it had many expressly specified exclusive rights which would have been wholly unnecessary to be expressly specified if it was intended by the parties that the oil company was to take over the entire leasehold interest of Little.

It seems to us that, in the taking of this contract between Little and the oil company within its four corners, it must be held to mean that Little did not part with his entire leasehold rights and interest in the premises to the oil company, though the contract contemplates that it continue in effect during the entire, remaining period of Little's lease from Barnes and wife. If there be any room for substantial doubt as to this meaning of that contract, looking alone to its language as compared with the language granting the leasehold estate from Barnes and wife to Little, such doubt, it seems to us, is all but conclusively removed by the construction which the parties themselves put upon the contract, as evidenced by the undisputed testimony above quoted.

Our conclusion is that Little did not part with his entire leasehold estate to the oil company, but retained rights of occupancy in the premises in some substantial measure, which at all times during the term of the contract were recognized by the oil company and enjoyed by Little.

We have not overlooked the rule generally recognized, as stated in 36 C. J. 376, that

"One who acquires by assignment the lessee's entire interest in a distinct part of leased land is as to such part in privity of estate with the lessor and liable to him for a proportionate share of the rent."

This, we think, is not a case of Little parting with a distinct, specified portion of the premises and retaining a distinct, specified portion of the premises, but it is a case of his according to the oil company its right

to the use of the premises in so far as necessary for the use contemplated by the terms of their contract, which manifestly did not call for the exclusive occupancy of any specified portion of the building.

This seems to be particularly true in the light of their own construction of the contract. The contract, as construed by them, seems to us to have plainly contemplated a joint use of the premises during the term of the contract; Little's right, of course, being subject to the right of occupancy and use by the oil company for its contemplated use, reasonably construed.

We conclude that the judgment must be affirmed. It is so ordered.

TOLMAN, C. J., MITCHELL, BEELER, and HERMAN, JJ., concur.